Parker, J.
These cases have been argued, by the direction of the court, on preliminary questions affecting the rights of the complainants in the court below to sue in the characters they respectively held.
Lawson Burfoot exhibited his bill in the character of “ one of the freeholders and housekeepers within the Manchester parish in the county of Chesterfield,” suing “ as well for himself, as for and on behalf of the other freeholders and housekeepers within the said parish.” He proceeded to state that the overseers of the poor for the county, by virtue of the act of assembly passed the 12th of January 1802, had sold certain glebe lands within that parish, and having collected the purchase money, had paid it over, by direction of the said freeholders and housekeepers or a majority of them, to Matthew Cheatham, their agent for the purpose of investing it in bank stock. That the money was so invested by Cheatham, and the dividends received by him, but that he had failed in his lifetime to pay them over, and that his administrators, although since applied to by the complainant, in his own right, and as agent duly appointed by and on behalf of the other freeholders and housekeepers, had still neglected and refused to pay them. The bill therefore was filed for an account and decree for the dividends remaining unpaid, with interest
*592 The defendants demurred to this bill, assigning as ® ® causes of demurrer, that if the complainant had any cause of action, he had a plain remedy at law; and moreover that he shewed no right to institute the suit, epber in his own behalf, or in behalf of the freeholders and housekeepers of the parish of Manchester. I shall pass over the first objection, and confine myself to the enquiry whether the plaintiff was authorized to sue under circumstances stated in the bill, admitting him t0 ^ave ^een the duly authorized agent of the freeholders and housekeepers, and prosecuting the claim for their benefit as well as his own ; and admitting also, for the sake of the argument, that the money was paid over to Cheatham to make an investment, by direction in writing under the hands of a majority of the freeholders and housekeepers, addressed to the overseers of the poor, and that the freeholders and housekeepers had authority thus to provide for the accumulation of the fund, before a final appropriation of it. Conceding all this, without which Burfoot would have no ground to stand upon, still I think the demurrer ought to have been sustained. " The act of assembly concerning glebe lands directs their sale by the overseers of the poor, and vests in them the right of action for the purchase money, and for all the purposes of carrying the act into effect. It does not give such right of action to the freeholders and housekeepers in any case, nor does it bestow upon them any property or interest in the fund. All that it does is to require the overseers, or a majority of them, to appropriate the money arising from the sale of the glebes, to the poor of the respective parishes, “ or to any other objects which a majority of the freeholders and housekeepers therein may direct, by a writing from under their hands, directed to the said overseers;” provided that no appropriation shall be made “ to any religious purpose whatsoever.” This is no more than a bare power or authority in the free *593 holders and housekeepers to direct the appropriation to other objects than the poor of the parish ; and unless it could be shewn that they had a right to appropriate to their own individual use, and had done so, to the extent of giving to themselves a common property in the fund, by a partial disposition of it for accumulation, they could not sue in their own names, nor in the name of an agent. But it seems clear to me that the act does not authorize an appropriation to private and individual uses. The “ other objects” spoken of must be intend-J _ ed public objects, of a nature similar to the support ol the poor, in respect of being a common benefit; and the appropriation to such objects is to be made by the overseers of the poor, and not by the freeholders and housekeepers. Their power is to direct the appropriation, and nothing more. Until the direction is given, the appropriation actually made, and all the purposes of the act fully accomplished, the right of action is vested and remains in the overseers of the poor, both by the terms of the law, and as trustees to carry it into complete effect. The object of the legislature, as shewn by the preamble and the enacting clauses of the act, was not to return the fund to the then freeholders and housekeepers of each parish, under the notion that it was drawn from their predecessors (for it was just as likely that the other inhabitants of the parish were the heirs and representatives of those contributing to purchase the glebes, as themselves): but the object was to apply it to the benefit of the people generally, on whom it devolved at the dissolution of the british government; and, as the best means of effecting that object, to authorize those particularly interested in the common good to direct the appropriation, for public uses. An appropriation to private, individual uses would not only have defeated the manifest purposes of the act, but have been attended with difficulties and inconveniences, arising out of the number and shifting character of the freeholders *594 and housekeepers, which we cannot suppose-to have been within the contemplation of its framers.
Again, the direction to pay over the fund to an agent for investment is no appropriation to any definite object, and therefore there are none to claim as persons in whose favour the power has been exercised. It is, at most, only a partial execution of the authority conferred by the act, which left in the freeholders and housekeepers nothing more than a bare authority to direct its farther application to the contemplated objects, uncoupled with property or interest, until, at least, such fur-^er appropriation was actually made. It is argued that the object was to increase the fund by accumulation, and'then finally appropriate it. If this be so, it cannot be pretended that the freeholders and housekeepers have a right to sue while the objects of appropriation remain uncertain. The cases in which one or more plaintiffs have been allowed to become the champions of the rights of others, as well as of their own, are all cases where there is a common property or interest involved, and not a mere authority delegated by lawn The principle on which they depend was clearly stated by lord Macclesfield in Chancey v. May, Prec. in Ch. 592. and is fully illustrated in the cases cited in 2 Madd. Ch. Pract. 180. and in Calvert on Parties to Suits in Equity, pp. 28. 29. 30.—but it is unnecessary to refer to them, as my opinion turns upon the right of the freeholders and housekeepers themselves to sue, and no one contends that one or more persons can bring a suit in the name of others, however numerous, who could not sue in their own names if their number were smaller.
So much for the case of Cheatham against Burfoot. As to the two other cases of Cheatham against Friend, I regret to say that I cannot distinguish them from the case of Wernick’s adm’r v. M’Murdo &c. 5 Rand. 51. which this court is bound to respect. They were commenced and *595 prosecuted throughout by successive administrators of Joseph and Edward Friend, to recover assets converted by Matthew Cheatham, a former administrator. They asked, indeed, for a general account; not, however, to enable them to distinguish between assets converted and assets remaining in kind, and to receive the latter; for every step in the cause shews that it was for assets administered they sued, not for assets unadministered. It appeared at an early stage of the cause, that the assets of the latter character had in fact been delivered up to the guardian of Edward O. Friend; and no further notice is taken of them in any future proceeding. The commissioner’s account, on which the final decree was obtained, includes converted assets alone. After that report was returned to court, the suits were revived by successive administrators de bonis non, claiming the benefit of that proceeding, and asking a decree for the balance found due, consisting altogether of converted assets ; and the final decree affirms their title to have the benefit of that proceeding, and to recover the assets so converted. Now, if Edward O. Friend had been only the administrator de bonis non of Joseph and Edward, it is plain, under the authority of Wernick’s adm’r v. M’Murdo &c. that he could not recover these assets, nor even ask an account of them. But it is said that the first administrators de bonis non sued in respect of their title to the unconverted assets; that Edward O. Friend the succeeding administrator had a right to revive that suit; and that, as he was also the heir, distributee and legatee of the two Friends, he might, in such revivor, include his claim to the converted assets, as he might, in an original suit, have claimed in both characters. The answer to this view of the case, satisfactory to my mind, is, first, that it is perfectly obvious the first administrators sued for converted assets alone; secondly, that Edward O. Friend made himself a party to the proceedings already had, in po other character than as *596 administrator de bonis non, the allegation in his first bill # % that he is also heir, devisee and legatee (which he omits in his subsequent amended bill) being merely the incidental statement of a fact, and not explanatory of cparacter ;n which he revived the suit; and thirdly, that if he had attempted to revive and to have the benefit of former proceedings, in a different character from the one originally asserted, and under which those Proceedings were had, he could not have succeeded, without a violation of fhe rules in relation to bills of revivor and supplemental bills, properly so called, or orig¡naj jjjjjg t[ie nature of supplemental bills. As to a mere bill of revivor it is unnecessary to speak. A supplemental bill must be in aid of what the court has already done; and it has been decided that if a plaintiff' sues without good title, but afterwards acquires if, he cannot make it effective by amending his bill. Pilkington v. Wignall, 2 Madd. Ch. Pract. 244. Story’s Equity Plead. 275. § 339. By a parity of reason, if one sues in one character, under title derived from that character, and dies, another having the same title, and also a different one, cannot make the last available by amendment or any other continuance of the original suit. Story’s Equity Plead, qua supra. One of the characteristics of a supplemental bill is, that the plaintiff sues in respect of the same title in the same person as stated in the original bill. Ibid. Calvert on Parties to Suits in Equity, pp. 96. 100. Mitf. Plead. 64. (margin.) There can in this mode be no change of interest affecting the questions between the parties, but only a change of the person in whose name the suit must be further prosecuted (Mitf. Plead, qua supra); and neither in this way, nor by an original bill in the nature of a supplemental bill, which lies wdiere new parties with new interests in the same subject are brought before the court (for the cases in which an original bill in the nature of a supplemental bill lies, see Story’s Equity Plead. 279. et *597 seq. § 346. 347. 348. 349. 350.) can persons set up different and distinct rights from those asserted in the original bill, nor can a party plaintiff in his own right have the benefit of proceedings instituted and conducted by persons claiming in a representative character. 'Edward O. Friend could only claim the converted assets by a different title from that asserted in the original bill, and for them his only remedy was by a new suit.
The case presented in this record amounts to this. Administrators de bonis non have instituted suits calling for the settlement of an administration account, which, according to Wernick’s adm'r v. M'Murdo &c. they had no right to investigate, and which it was not necessary to investigate, to enable them to recover assets unadministered. The settlement is made of the converted assets alone, and then another person attempts to obtain the benefit of that proceeding, not by the same title first asserted, but by a different and even hostile one, having no privity with the other. And that title is set up for the first time in this court; although it is perfectly obvious, that in the court below, all the proceedings were conducted, and the decree finally obtained, by virtue of the title asserted in the original bill. All this appears to me to be entirely irregular, and must cause a reversal of the decree ; however reluctant we may be, after the proceedings have been spun out to such a length, and when great injustice may be the possible consequence, to pronounce such an opinion.
The other judges concurred. Decree reversed, and bills dismissed.